F I L E D
Clerk
District Court

NOV 08 2013

for the Northern Mariana Islands
By_____
(Deputy Clerk)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN MARIANA ISLANDS

DONALD G. FLORES,

                     Plaintiff,

   v.

FIRST HAWAIIAN BANK and
UNION BANK OF CALIFORNIA,

                    Defendants.

Case 1:11-CV-00022

**DECISION AND ORDER GRANTING DEFENDANT UNION BANK'S MOTIONS FOR SUMMARY JUDGMENT ON GROUNDS OF STATUTE OF LIMITATIONS AND LACHES**

## I.      INTRODUCTION

Plaintiff Donald G. Flores ("Flores") brought this action against Defendants First Hawaiian Bank ("FHB") and Union Bank of California ("UB") to collect principal and interest on a $200,000, 32-day certificate of deposit eighteen years after he took it out at UB's Saipan branch in 1993. In the interim, in 2001, UB sold its Saipan assets to FHB and closed its Saipan office. FHB has already been dismissed out of the case. (*See* Memorandum Opinion and Order, May 2, 2012, ECF No. 42.) UB now moves for summary judgment on grounds that all of Flores' causes of action are time barred – either by the applicable statutes of limitations or by the equitable doctrine of laches.[1] The motions have been fully briefed.[2] After due consideration of all the papers, as well as argument of counsel for

[1] Motion for Summary Judgment as to All Claims Due to Laches (ECF No. 81); Motion for Partial Summary Judgment Re: Statute of Limitations for Breach of Contract, Tort (Negligence & Fraud), and Consumer Protection Act Claims (ECF No. 83). Notwithstanding the word "Partial" in the caption, UB asserts that all claims are barred by the applicable statutes of limitations.

[2] *See* Flores' Opposition Re: Laches (ECF No. 87); Flores' Opposition Re: Statute of Limitations (ECF No. 89); UB's Reply Re: Statute of Limitations (ECF No. 95); UB's Reply Re: Laches (ECF No. 98).

both parties made at a hearing on October 30, 2013, the Court GRANTS summary judgment to UB on all counts.

## II.    UNDISPUTED FACTS

The following facts are undisputed:

On September 10, 1993, Flores went to UB's Oleai branch in Saipan to cash a $280,000 check he had received in a land transaction. (FAC ¶ 6.)[3] After cashing the check, he kept $80,000 in cash and invested $200,000 in a fixed-maturity time certificate of deposit ("TCD"). (FAC ¶¶ 6, 10.) The non-negotiable, non-transferable TCD matured after 32 days, on October 12, 1993, and earned 2.5 percent interest payable at maturity. (Copy of TCD, ECF No. 83-2, ex. A.)  Printed on the front of the TCD is a disclaimer: "This certificate earns no interest after maturity . . ." (*Id.*) The TCD was made out to Donald G. Flores and was payable to him "upon maturity, presentation and surrender of this certificate, properly endorsed at the office of issue." (*Id.*) Lourdes ("Lou") Salas Deleon Guerrero, a UB officer, helped Flores take out the TCD, and she signed the TCD as UB's authorized agent. (Deposition of Donald G. Flores ("Flores Deposition"), ECF No. 83-1, ex. 3, 40:10–16;[4] FAC ¶ 7.) At the time, Flores' wife, Cecilia Flores ("Cecilia"), was seriously ill and in need of costly

---

[3] The purported verification of the FAC is defective – it was not made under penalty of perjury as required by 28 U.S.C. § 1746. UB has not objected to consideration of the FAC as evidence supporting summary judgment. UB included the FAC as an exhibit to its summary judgment motions and cited from it liberally in its own statements of undisputed fact. In the absence of an objection, the undisputed facts in the FAC may support summary judgment. *See Faulkner v. Federation of Preschool & Community Education Centers,* 564 F.2d 327, 328 (9th Cir. 1977) (per curiam).

[4] Page references are to the ECF pagination.

medical treatment. (Flores Deposition 44:19–45:18.) Flores knew that he was purchasing a 32-day TCD and chose that period of maturity because he did not want to incur an early-withdrawal fee if he needed to access the funds soon. (*Id.* 45:3–6, 46:11–24.) He believed that Guerrero had told him the TCD would roll over if he did not redeem it. (FAC ¶¶ 11, 12.)

Soon after Flores purchased the TCD, he and Cecilia left for Huntington Beach, California, where she received medical treatment. (Flores Deposition at 49:7–50:6.) Over the next few years, Cecilia stayed in California, but Flores traveled periodically to Saipan to manage his farming business. (*Id.*) In April 1994, during a Saipan visit, Flores went to UB's Oleai branch to check on a checking account he had there, but he did not ask about the TCD. (*Id.* 58:14–59:16.) He did not intend to redeem the TCD at that time. (*Id.* 80:19–25.)

In February 1999, Flores returned to Saipan when he and Cecilia were running low on funds to pay for her continuing medical needs. (*Id.* 60:24–61:10.) On or about February 10, 1999, Flores went to UB's Oleai branch and asked Guerrero if she remembered the $200,000 TCD. (*Id.* 61:11–19; FAC ¶ 17.) Flores had been unable to find the original TCD and had no paperwork with him when he went to the bank that day. (Flores Deposition 62:13–25.) Guerrero remembered that Flores had purchased the TCD. (*Id.* 81:9–14.) She left her desk for ten minutes to search the bank's records using Flores' social security number, but she was unable to find a record of the TCD. (*Id.* 82:15–22; FAC ¶ 18.) When Flores asked how he can get his money, Guerrero told him to provide the TCD. (Flores Deposition 82:8–10.) There was no discussion of other ways that Flores might be able to get his money if he could not find the TCD. (Flores Deposition 82:5–17.)

Ken Kato was UB's Oleai branch manager at the time Flores purchased his TCD. (Declaration of Ken Kato, ECF 83-4, ¶ 4.) UB had a policy to retain account records, including records of CDs, for seven and a half years after an account was closed. (*Id.* ¶ 6.) UB would send a 1099-INT tax form showing interest income to every customer who earned interest on a CD. (*Id.* ¶ 9.) In the event a customer lost the original CD, UB would allow the customer to redeem it so long as UB had records showing the CD had not yet been redeemed. (*Id.* ¶ 8.) The customer would be asked to sign an agreement indemnifying the bank in case the original was later located and redeemed. (*Id.*) The indemnification agreement would be attached to UB's copy of the CD. (*Id.*)

On November 8, 2001, UB sold its Saipan and Guam assets and liabilities to First Hawaiian Bank ("FHB"). (*Id.* ¶¶ 3, 10.) Prior to the sale, UB mailed letters to all its customers, including CD holders, advising them of the sale and explaining how their accounts would be handled. (*Id.* ¶ 10.) Flores, nonetheless, did not know about the sale at the time it occurred, but at some point he learned about it from media coverage. (Flores Deposition 86:12–24.) By September 2003, Flores had opened an FHB checking account and was aware that FHB had bought the assets and liabilities of UB's Oleai branch. (*Id.* 87:7–88:3.)

Between February 1999 and March 2008, Flores made no attempt to cash, redeem, or otherwise obtain the principal and interest from his TCD. (*Id.* 88:8–13.)

In March 2008, Cecilia found the original TCD. (*Id.* 88:4–7.) Flores immediately contacted FHB and met on Saipan with Victoria Concepcion, an FHB employee. (FAC ¶ 27.) He showed the TCD to Concepcion. (Deposition of Victoria Concepcion ("Concepcion Deposition"), ECF No. 83-

1, ex. 5, 123:10–12.) Concepcion told him to check with UB because FHB did not have any records. (*Id.* 123:15–18.)

On June 10, 2008, Jose S. Dela Cruz, an attorney representing Flores, addressed a letter to UB's corporate headquarters in San Diego, California. (ECF No. 83-1, ex. 2C.) Dela Cruz enclosed a copy of the original TCD. (*Id.*) He advised UB that Flores wanted to withdraw the $200,000 principal and "all the interest that such principal amount has generated since the date of deposit— September 10, 1993." (*Id.*) He asked that UB let him know "how it plans to handle this matter." (*Id.*)

On September 1, 2008, Dela Cruz wrote a second letter to UB, this time addressed to Lisa Mednick, manager of UB's San Diego main branch. (ECF No. 83-1, ex. 2D.) Dela Cruz stated that he had not received a reply to his June 10 letter to corporate headquarters. (*Id.*) He asked Mednick to respond as soon as possible and advised her that if a response were not forthcoming, "additional steps" may be necessary to retrieve Flores' money. (*Id.*)

On September 22, 2008, Cheryl Robbins, of UB's Office of the President, wrote to Dela Cruz. (ECF No. 83-1, ex. 2E.) She acknowledged receipt of Dela Cruz's two letters. (*Id.*) She said that UB no longer had records from the time frame of Flores' TCD. (*Id.*) She advised Dela Cruz to file a claim with the State of California in order to determine whether the TCD had escheated. (*Id.*)

## III.    PROCEDURAL HISTORY

On September 22, 2011, Flores filed suit against UB and FHB in the Superior Court of the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth") to recover compensatory and punitive damages for alleged breach of contract, unjust enrichment, negligence and gross negligence, fraud, and violation of the Commonwealth's Consumer Protection Act

("CPA"). (Complaint, attached to ECF No. 1.) On October 21, 2011, FHB removed the action to federal court on the basis of diversity jurisdiction. (Defendant FHB's Notice of Removal, ECF No. 1.) On October 31, 2011, UB joined in FHB's notice of removal. (ECF No. 8.)

On February 15, 2012, the Court dismissed all claims against FHB, and granted in part and denied in part UB's motion to dismiss. (Memorandum Opinion and Order, ECF No. 23.) The unjust enrichment and gross negligence claims were dismissed with prejudice; Flores was given leave to amend the complaint to cure defects in the other causes of action. (*Id.*)

On February 26, 2012, Flores filed a First Amended Complaint ("FAC," ECF 24) against both banks. On March 7, 2012, FHB moved to dismiss the FAC (ECF No. 28). On May 2, the Court granted the motion and dismissed FHB from the lawsuit. (Memorandum Opinion and Order, ECF No. 42.)

## IV.    LEGAL STANDARD

A court must grant summary judgment if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movants must support their position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party on the evidence presented; a mere "scintilla of evidence" is not sufficient. *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.*

The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999)). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir. 1989) (quoting *Angel v. Seattle-First Nat'l Bank,* 653 F.2d 1293, 1299 (9th Cir. 1981)).

In a diversity action raising state law claims, the substantive law of the forum state applies. *See Medical Lab. Mgmt. Consultants v. ABC,* 306 F.3d 806, 812 (9th Cir. 2002). "The task of a federal court in a diversity action is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.,* 615 F.2d 857, 861 (9th Cir. 1980). "When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Kona*

*Enters., Inc. v. Estate of Bishop,* 229 F.3d 877, 885 n. 7 (9th Cir. 2000) (quoting *Aetna Cas. & Sur. Co. v. Sheft,* 989 F.2d 1105, 1108 (9th Cir. 1993)). In the absence of controlling precedent from the state's highest court, a court may "look to other state-court decisions, well-reasoned decisions from other jurisdictions, and any other available authority to determine the applicable state law." *Burns v. Int'l Ins. Co.,* 929 F.2d 1422, 1424 (9th Cir. 1991). "When there is no dispositive Commonwealth authority on an issue, we may look to persuasive authority from other jurisdictions." *Commonwealth v. Lot No. 353 New G,* 2012 MP 6 ¶ 16 (N. Mar. I. 2012). Rules of the common law, including the Restatements, "shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary." 7 CMC § 3401.

## V.    DISCUSSION

### a.   Statute of Limitations

UB asserts that all of Flores' claims – breach of contract, negligence, fraud, bad faith, and CPA violation – are barred by the applicable statutes of limitations. In the CNMI, breach of contract claims must be commenced within six years of accrual. 7 CMC § 2505 (catch-all statute of limitation); *Century Ins. Co., Ltd. v. Guerrero,* 2009 MP 16 ¶ 7. On claims arising under the CPA, the limitations period is four years. 4 CMC § 5110. The statute of limitations on tort claims is two years after accrual. 7 CMC § 2503(d).

### 1.   *Breach of contract*

Under the Uniform Commercial Code ("UCC") of the Northern Mariana Islands , "[a] cause of action against the obligor of a demand or a time certificate of deposit accrues upon demand, but

demand on a time certificate may not be made until on or after the date of maturity." 5 CMC §

3122(2). Flores maintains that he did not demand payment until June 10, 2008, when his attorney

sent a copy of the TCD to UB's corporate headquarters and asked in writing to withdraw his money.

UB contends that Flores demanded payment at UB's Oleai branch in February 1999. In the

alternative, UB suggests that the cause of action accrued, without the necessity of a demand, when

UB ceased doing business on Saipan in November 2001 and demand at the issuing branch became

futile.

UB's alternative theory is not persuasive. It is based on the Eleventh Circuit's recent holding

that under New York law, demand is futile and unnecessary "when a foreign branch closes but the

home office is still open and capable of receiving a demand." *Nguyen v. JP Morgan Chase Bank NA,*

709 F.3d 1342, 1347 (11th Cir. 2013). In *Nguyen,* Chase's Saigon office was forced to shut its doors

days before North Vietnamese forces rolled into that city in April 1975. *Id.* at 1344. In 2006, a

Saigon depositor's daughter demanded payment on various accounts from Chase in the United

States. *Id.* The Eleventh Circuit found that when the Saigon branch ceased to function in 1975,

Chase breached its implied contract with Nguyen, a cause of action for breach accrued and the

statute of limitations on the breach claim began to run, without need for demand. *Id.* at 1347–48. It

based its ruling on a 1928 New York case involving claims against a bank's Russian branches whose

operations had been disrupted by the 1917 revolution. *See Sokoloff v. National City Bank of New*

*York,* 250 N.Y. 69, 164 N.E. 745 (1928). It is "in this context" that the Eleventh Circuit found

demand for payment to be futile. *Nguyen,* 709 F.3d at 1347. The context for UB's closure on Saipan

is quite different. The CNMI is a United States commonwealth, not a foreign country. UB was not

forced to close in a matter of days by historical circumstances beyond its control, but made an orderly exit from Saipan after a business decision to sell its assets to another United States bank. In this context, demand was not futile.

Because demand was not futile, the determination of this motion depends on when demand actually occurred. The UCC does not define the term "demand." When a term is not defined by statute, Commonwealth courts strive "to ascertain what the legislature intended by applying the plain meaning" of the word. *Commonwealth Ports Authority v. Hakubotan Saipan Enterprises, Inc.,* 2 N. Mar. I. 212, 222 (1991). Courts "should avoid interpretations of a statutory provision which would defy common sense [or] lead to absurd results." *Id.* at 224 (internal citation omitted). A statute is ambiguous if its language "is confusing to a well informed person[,]" and any ambiguities "should be resolved in favor of a just, equitable, and beneficial operation of the law." *Bank of Hawaii v. Sablan,* 5 N. Mar. I. 75 ¶ 10 (1997) (internal citation omitted).

Black's Law Dictionary defines demand as "the assertion of a legal or procedural right." Black's Law Dictionary 462 (8th ed. 2004). This broad definition has a long lineage. "In 18 C.J. [Corpus Juris] 479, a 'demand' is defined as: 'The assertion of a legal right; the assertion of a right to recover a sum of money.'" *In Re Baltimore Pearl Hominy Co.,* 5 F.2d 553, 555 (4th Cir. 1925). "[T]he term 'demand' is one of very extensive import—among the most so, indeed, of any that are known to the law." *In Re Denny,* 2 Hill 220, 223 (N.Y. 1842). Unless the statute specifies a particular form or wording, "[t]o constitute a sufficient demand, one need not employ the word 'demand,' nor will other formal acts or words, or a personal demand, usually be considered necessary." *Freitag v. Huiskamp,* 166 N.W.2d 915, 919 (Iowa 1969) (quoting 26A C.J.S. Demand,

p. 169). For a demand to be sufficient, "[a]ll that is required is the assertion of the right under the contract and a request for compliance therewith." *Nat'l Life & Acc. Ins. Co. v. Dove,* 174 S.W.2d 245, 247 (Tex. 1943). Where a statute is silent as to form, an oral demand for payment may be sufficient so long as the demand is precise and certain. *Monroe Firefighters Ass'n v. City of Monroe,* 14 Wage & Hour Cas. 2d (BNA) 1385 (W.D. La. 2009) (construing Louisiana's Wage Payment Act); *Hampton v. Allstate Ins. Co.,* 48 F. Supp. 2d 739, 746 (M.D. Tenn. 1999) (phrase "formal demand for payment" in Tennessee statute did not require demand in writing); *Peoria Sav. And Loan Ass'n v. Jefferson Trust and Sav. Bank of Peoria,* 410 N.E.2d 845, 849 (Ill. 1980) (cause of action accrued upon telephone call demanding payment on check).

Flores asserts that to trigger accrual of a cause of action under Commonwealth law, a demand must be made in writing. In support he cites to a Florida case, *Penagos v. Capital Bank,* 766 So.2d 1089 (Fla. App. 2000). In *Penagos,* plaintiff had made periodic inquiries about his 1988 TCD before making written demand for payment in 1991. In 1995, he filed suit. *Id.* The bank asserted that the cause of action accrued on the date the TCD matured in 1988 and that, therefore, it was barred by the state's five-year statute of limitations. *Id.* at 1090. The court found that plaintiff's action, brought in 1995, was timely because "the accrual date is the date of written demand by the depositor." *Id.* Florida's statute accruing causes of actions on TCDs "upon demand" was the same as the Commonwealth's. The Florida court interpreted "upon demand" to mean a written demand because the analogous Florida statute of limitations expressly required "written demand for payment" as an element for accrual. *Id.* (citing § 95.031(1), Fla. Stat. (1987)).

*Penagos* does not settle the matter in Flores' favor. In contrast to Florida, the Commonwealth's limitations statutes do not specify that a demand must be in writing. There is no need to read into the Commonwealth's UCC "upon demand" language at 5 CMC § 3122(2) a requirement for a writing so as to harmonize it with 7 CMC § 2505, the applicable statute of limitation.[5]

The fact that some Commonwealth statutory provisions expressly require a written demand – for example, 5 CMC § 2609 (written demand of adequate assurance of due performance), 7 CMC § 2442 (written demand to pay bounced check) – does not mean that the requirement of a writing should be applied to all demands. For example, 5 CMC § 2702 provides, "Where the seller who discovers that the buyer has received the goods on credit while insolvent he may reclaim the goods *upon demand* made within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller *in writing* within three months before delivery the 10 day limitation does not apply" (emphasis added). The Commonwealth statute tracks § 2-702 of the Uniform Commercial Code ("U.C.C."). In construing U.C.C. § 2-702, courts have not read the "in writing" requirement of the waiver provision to imply a requirement that the seller's demand be in writing. Indeed, courts have frequently noted that a significant difference between U.C.C. § 2-702 and 11 U.S.C. § 546(c), the analogous provision of the Bankruptcy Code, is that § 546(c) expressly requires the seller to demand reclamation in writing, whereas the U.C.C. does not. *See, e.g., In Re MGS Marketing,* 111 B.R. 264, 267 (B.A.P. 9th Cir. 1990); *In re Rawson Food Serv., Inc.,* 846 F.2d 1343,

---

[5] "All actions other than those covered in 7 CMC §§ 2502, 2503, and 2504 shall be commenced within six years after the cause of action accrues or, in the case of actions brought by or on behalf of the former Saipan Credit Union or its depositors, shareholders, investors, or guarantors on account of their interest therein, within 10 years after the cause of action accrues." 7 CMC § 2505.

1347 (11th Cir. 1988); *In Re Flagstaff Foodservice Corp.,* 14 B.R. 462 (Bankr. S.D.N.Y. 1981) (legislative history of U.C.C. and Bankruptcy Code provisions). The cases hold that the only remedy against a debtor in bankruptcy is under the strict terms of the Bankruptcy Code, not U.C.C. § 2-702 as enacted in various states. Thus, a creditor whose officer had telephoned debtor's manager and demanded return of goods, but did not make a written demand, could not shelter under U.C.C. § 2-702. *In Re Koko Corp.,* 20 B.R. 241 (B.A.P. 1st Cir. 1982).

Flores asserts that an effective demand must include presentment of the TCD itself. In support, he offers no argument but merely quotes an isolated sentence from a First Circuit case: "Demand occurs upon presentment and refusal to pay." *Edelmann v. Chase Manhattan Bank, N.A.,* 861 F.2d 1291, 1303 (1st Cir. 1988). In both *Edelmann* and the case that the *Edelmann* court quoted, *Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645, 648 (2nd Cir. 1984), this conclusory statement is merely dicta, "language in an opinion which is not necessarily involved nor essential to determination of the case at hand" and therefore "not binding as a rule of law." *Rosario v. Camacho,* 2001 MP 3 ¶ 64 (N. Mar. I. 2001). The Ninth Circuit rejected the *Garcia/Edelmann* rule when interpreting California law on accrual of claims for return of a bank deposit. *See Huynh v. Chase Manhattan Bank,* 465 F.3d 992, 998 (9th Cir. 2006).

That presentment and refusal to pay are sufficient to establish demand does not mean they are the *only* way a sufficient demand can be made. Presentment is a species of demand, "a demand for acceptance or payment made upon the maker, acceptor, drawee, or other payor by or on behalf of the holder." 5 CMC § 3504(1). To constitute presentment, the demand must be made in one of three enumerated manners – by mail, through a clearing house, or at the place for payment specified in the

instrument. 5 CMC § 3504(2). Presentment is a condition precedent necessary to charge secondary parties with liabilities. 5 CMC § 3501; *Trousdale v. Albers,* 105 S.W.2d 456, 458 (Tex. Civ. App. 1937). The party to whom presentment is made has certain rights – to require the instrument be exhibited and to see reasonable identification of the person making presentment – without dishonoring the instrument. 5 CMC § 3505. In short, presentment is "something more than a demand of payment[.]" *Robinson v. Lancaster Foundry Co.,* 136 A. 58, 60 (Md. 1927) (demand by telephone not presentment).

Having determined that a demand may be oral and does not require presentment, the Court next considers whether Flores made a demand at UB's Oleai branch in February 1999. The material facts as to what Flores said to Guerrero are not in dispute, but the parties disagree on the legal significance of those facts. The Court, therefore, may render summary judgment as to whether Flores made a demand. *See Lincoln Nat'l Life Ins. Co. v. TCF Nat'l Bank,* 875 F. Supp. 2d 817, 826 (N.D. Ill. 2012) ("The Court may resolve a dispute on summary judgment where the parties do not dispute the facts that actually occurred, but merely dispute the legal significance of those facts."); *Tandy Corp. v. City of Livonia,* 81 F. Supp. 2d 800 (E.D. Mich. 1999) ("While the parties dispute the legal significance of these facts, the facts themselves are not in dispute, and summary judgment is therefore appropriate as to this issue.").

The best evidence on this point is Flores' deposition testimony:

> MR. FRINK [counsel for UB]: Okay. And then the next time you came back to the Bank about the TCD, the bank being Union Bank, was in February of 1999, is that correct?
> MR. FLORES: That is right.

MR. FRINK: Okay. And that's the time that you spoke with Ms. DeLeon Guerrero?

MR. FLORES: That is right.

MR. FRINK: Okay. And she remembered that you had purchased the $200,000.00 TCD?

MR. FLORES: That is right.

MR. FRINK: Okay. But she could not find any records regarding that TCD?

MR. FLORES: That's right.

MR. FRINK: And you did not know at that time where the original TCD was?

MR. FLORES: That is right.

MR. FRINK: Okay. At that time you were trying to figure out how to get it cashed or what to do with it? You wanted to do something with the $200,000.00 plus the interest?

MR. FLORES: Yeah and I asked for the TCD.

MR. FRINK: Okay.

MR. FLORES: Yeah.

MR. FRINK: You asked for the TCD?

MR. FLORES: No for the money, the $200,000.00.

MR. FRINK: Okay. And she told you they couldn't give it to you without the TCD?

MR. FLORES: That's right.

MR. FRINK: Okay. And was there any discussion with her at that time about possible ways that you could get the money without actually presenting the original TCD?

MR. FLORES: Discussing how I get my money, yeah. I just said so, how can I get my money, she says, you provide the TCD.

(Flores Deposition 81:2–82:10)

MR. FRINK: Okay. So what acts did Union Bank either do or failed to do that you are alleging constituted fraud?

MR. FLORES: They failed to tell me that they still got my money in there.

MR. FRINK: Okay. And when was that?

MR. FLORES: When I went over there in 1999.

MR. FRINK: Okay. And this was the conversation with Lou Guerrero?

MR. FLORES: Yes.

MR. FRINK: Okay.

MR. FLORES: Lou Guerrero.

MR. FRINK: Yeah. They failed to tell you that they still had your money there?

MR. FLORES: Yes.

15

MR. FRINK: And that's because you asked for the money and she wouldn't give it to you?

MR. FLORES: She said there is no record.

MR. FRINK: Okay. And were you there to get your money? Is that what you saying?

MR. FLORES: Yes.

MR. FRINK: Okay.

MR. FLORES: I came to check on it, yeah and get my money.

(Flores Deposition 70:10–71:7)

MR. FRINK: You just stated that Mrs. DeLeon Guerrero may not have been lying to you when she told you on or about February 10, 1999 that there were no records regarding your TCD, correct?

MR. FLORES: When she didn't come—when she said no records, she is lying to me.

MR. FRINK: She was lying to you?

MR. FLORES: Yeah. She should answer yes, I have the record.

MR. FRINK: What makes you think that?

MR. FLORES: Because I deposited the $200,000.00 in the Union Bank and I came looking for it and she said there is no record. What can I say with that?

(Flores Deposition 74:21–75:9)

From Flores' own testimony, it is clear that on February 10, 1999, he did not go to UB's Oleai branch merely to "check" on his money, but also to "get" it. (Flores Deposition 71:7.) He asked Ms. Guerrero "for the money, the $200,000.00" (*id.* 81:25), and the bank would not give it to him. Although he could not, at that time, present the lost original TCD, he demanded payment on it as surely as if he had handed Ms. Guerrero the instrument. Because Flores demanded payment on February 10, 1999, his cause of action for breach of contract accrued on that date. Therefore, his claim for breach of contract, made on September 22, 2011, when he brought suit in the Commonwealth Superior Court, is barred by the six-year statute of limitations.

/ /

16

2.   *Tort and CPA Claims*

The parties agree that the statute of limitations on Flores' tort claims is two years. *See* 7

CMC § 2503(d). Claims accrue "when a suit may be maintained . . . thereon." *Zhang v. CNMI,* 2001

MP 18 n.11 (internal citation omitted). The question of when a claim accrues is an issue of law. *Bd.*

*of Trustees of the N. Mariana Islands Retirement Fund v. Ada,* 2012 MP 10 ¶ 9 (N. Mar. I. 2012).

The Commonwealth Supreme Court has not determined when tort claims accrue.

Tort claims may accrue upon injury or upon discover. The so-called "discovery rule"

postpones accrual until a plaintiff learns or has reason to learn that a claim exists. *See Platt Elec.*

*Supply, Inc. v. EOOF Elec., Inc.,* 522 F.3d 1049, 1054 (9th Cir. 2008). Federal tort claims accrue

when a plaintiff becomes aware of an injury and aware that defendant caused the injury, and is not

postponed until he or she becomes aware of a legal claim against another for breach of a duty. *See*

*United States v. Kubrick,* 444 U.S. 111, 122–24 (1979).

Whatever injury Flores may have suffered through UB's alleged negligence or fraud

occurred in 1999, when UB refused his demand for payment on the mature TCD because it did not

have any record it.  Flores was aware of the injury immediately, and was aware that UB caused the

injury.  It is irrelevant that Flores did not at that moment have all the facts he needed to piece

together the puzzle of what happened to his money.  Based on recent deposition testimony of another

UB and FHB employee, Victoria Conception, Flores now believes that an impersonator telephoned

UB sometime prior to 2001 demanding payment on the TCD, and that UB cashed it for that person.

(*See* Reply, ECF No. 89, at 12–13.) This notion – that a cause of action does not accrue until all the

facts are in – would lead to the absurd result that a cause of action for fraud and negligence did not

accrue until after plaintiff had already sued for fraud and negligence. Any reasonable investor, when told that her bank had lost track of more than $200,000 of her money, would suspect immediately that the bank had somehow done her wrong and she needed to take action. Flores' tort claims accrued at the same time as his breach-of-contract claim, in February 1999, and are barred by the statute of limitations. Notably, even if accrual did not occur until his lawyer wrote to UB in June 2008, Flores' claims, first brought in September 2011, would be outside the two-year limitations period.

An action to enforce the CNMI's Consumer Protection Act must be brought within four years of accrual. 4 CMC § 5110. The claim is based on allegations of unfair and deceptive practices. Flores should have been aware of such a claim in 1999 when UB refused his demand for payment based on its representation that it had no record of any CD owned by him.  This representation of UB was made by Lou Guerrero, the same person who remembers having helped Flores open the account in 1993.   It too, therefore, is untimely.

b.  <u>Laches</u>

UB asserts that Flores' claims, if not barred by the statute of limitations, are barred by operation of the equitable doctrine of laches. Laches is "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Rios v. Marianas Public Land Corp.,* 3 N.M.I. 512, 523–24 (1987) (quoting *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020, 1029–30 (Fed. Cir. 1992)). A defendant who asserts laches bears the burden to prove (1) unreasonable delay in plaintiff's filing suit from the time he should have discovered the claim,

and (2) prejudice or injury to defendant in defending against the claim. *Id*. at 524. "The law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry*." Johnston v. Standard Mining Co.,* 148 U.S. 360, 370 (1893) (quoted in *Kling v. Hallmark Cards, Inc.,* 225 F.3d 1030, 1039 n.4 (9th Cir. 2000)).

Laches is an equitable defense distinct from the statute of limitations. *Jarrow Formulas, Inc., v. Nutrution Now, Inc.,* 304 F.3d 829, 835 (9th Cir. 2002). Historically, laches was a defense only to equitable claims not subject to a statute of limitations. *Id.* In modern practice, however, even if a claim is made within the limitations period, laches may in some circumstances bar it. *See Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 954 (9th Cir. 2001) (suit within 3-year SOL for copyright infringement); *Petrella v. Metro-Goldwyn-Mayer, Inc.,* 695 F.3d 946, 958–59 (9th Cir. 2012) (Fletcher, J., concurring) (on Ninth Circuit's generous application of laches to bar suit by copyright owners), *cert. granted,* 186 L. Ed. 2d 962, 82 U.S.L.W. 3177 (U.S. Oct. 1, 2013) (No. 12-1315).

If any of Flores' claims are not time barred, they are barred by laches. First, Plaintiff unreasonably delayed bringing the action from the time he should have discovered that he had a claim. In February 1999, Lou Guerrero of UB told Flores that the Oleai branch had no record of his 1993 TCD despite the fact that she remembers having opened up the account for him in the first place. When Flores asked how he was supposed to get his money, she told him to provide the original TCD, which Flores thought was lost. Despite knowledge of these facts, Flores took no further action for nine years, until 2008. He did not ask to speak to the branch manager, or write to

UB's main office to ask them to search for a record. He did nothing to get his money despite his need for it due to his wife's medical expenses.  For nine years, he did no more than hope his copy would turn up. Other than the 1999 meeting with Deleon Guerrero, he does not recall any conversations with anybody at UB about the TCD until 2008. (*Id*. at 65:23–66:12.) His wife Cecilia testified, at her deposition, that between 1999 and 2008, when she and her husband were going back and forth between California and Saipan and desperately needed money, they did no more than keep looking for the missing original CD:

> MR. LIZAMA (Flores' counsel): Did you ever think of going to the bank to discuss with the bank the problem with this money?
> MRS. FLORES: No.
> MR. LIZAMA: You never?
> MRS. FLORES: I don't know, I don't recall, no. I don't recall.
> MR. LIZAMA: You don't?
> MRS. FLORES: No.
> MR. LIZAMA: So, did you? What was your thought at the time when you knew that there was this deposit and there was a time when you needed money?
> MRS. FLORES: No, I couldn't find it.
> MR. LIZAMA: You never thought of going to the bank and insisting that you should be paid because you have your money in the bank?
> MRS. FLORES: Not without the certificate. You could not get your money back unless you showed them the certificate.
> MR. LIZAMA: How do you know that?
> MRS. FLORES: Because I couldn't find the certificate.
> MR. LIZAMA: Was it your fault that you couldn't get your money unless you have your certificate?
> MRS. FLORES: That's my thought because you could not get anything if you didn't have proof that you have the money in there.
> MR. LIZAMA: Did anybody tell you that or?
> MRS. FLORES: No. I just.
> MR. LIZAMA: Just thought that was the case?
> MRS. FLORES: Uh-uh.

(Cecilia Flores Deposition, ECF No. 83-1, 139:21–140:22)

Already in 1999, Flores had reason to suspect that UB had negligently lost record of the TCD or was defrauding him, yet he and his wife took no further action. Flores' deposition testimony, quoted earlier at length, establishes that he was on notice as of his conversation with Lou Guerrero in 1999 that the bank may be defrauding him (*Id*. at 70:10–18, 71:3–14).

Second, the unreasonable delay has prejudiced UB. According to Ken Kato, UB's Saipan branch manager, records relating to closed TCD accounts were routinely destroyed after seven and a half years. (Kato Declaration, ECF No. 83-4 ¶ 6.) If a customer lost his or her copy of a TCD, the bank would nonetheless redeem it without presentment if a check of bank records showed the instrument had not yet been redeemed. (Id. ¶ 8.) When a TCD matured, UB would try to get ahold of the customer by telephone or even in person to ask what the customer wished to do with the account. (Kato deposition testimony, ECF 83-1, 113:4–23.) Prior to closing the Saipan branch, UB mailed notice to all its account holders about the sale of assets to FHB. (Id. ¶ 10.) Additionally, each year UB would send TCD holders a 1099 form showing interest on their account. (Id. ¶ 9.)  Had Flores pursued his claim with UB within seven and a half years after his TCD matured in 1993, which includes the time he was denied his money in 1999 by Lou Guerrero, UB may have records to show the existence of the transaction despite Guerrero's statement that UB had no records of his TCD. UB may also have records to show payment of the TCD.

UB has some evidence to show that Flores cashed out the TCD sometime prior to 2001. UB's Victoria Concepcion recalls that Flores telephoned the Oleai branch from California to obtain funds for his wife's medical treatment. (Concepcion Deposition, ECF 83-1, 128:10–25.) She believes the bank either wired Flores the money or deposited it in his checking account. (*Id.*) But in part because

of the lapse of time, she is unable to recall in what year this transaction occurred or remember many details of the transaction other than it was while she was still working for UB. (*Id.* 131:11–21.) Had Flores followed up with his demand sooner, UB may be able to confirm Concepcion's recollection. However, over time, memories have degraded and records, such as a register copy of the alleged transaction (*id* 129:14–24), have been destroyed, hampering UB from proving its defense at trial. By 2008, when Flores' lawyer first wrote to UB in San Diego, all the bank's records of this and other transactions from which to defend against this lawsuit would have been routinely destroyed.

Moreover, time has taken a toll on tax and other financial records in Flores' possession. In response to discovery requests for tax returns dating back to 1993 that might show income from the TCD if it had been redeemed soon after it matured (one of UB's theories of defense), Flores stated that his files were destroyed by termites years ago. (Flores Deposition 67:8–17.) Form 1099s that would show interest earned on the TCD in 1993 and subsequent years (if, as Flores asserts and UB denies, the TCD rolled over automatically) are likewise missing.

Other courts have found laches on similar facts in cases involving lost or misplaced TCDs. In *Schnack v. Valley Bank of Nevada,* 291 Fed. Appx. 168 (10th Cir. 2008) (unpubl.), a depositor tried to redeem a $500,000 TCD fifteen years after it had matured. When the bank refused, he waited three more years before suing. *Id.* at 173. The court found that the plaintiff had failed to exercise reasonable diligence in protecting his rights and that the bank was prejudiced thereby because records necessary to its defense had been destroyed pursuant to a reasonable records retention policy. *Id.* "It is untenable and unreasonable," the court found, "to leave a $500,000 ninety-day TCD unchecked for fifteen years, and then charge the bank with liability after it justifiably destroyed its

records." *Id.; cf. Schiavone v. Bank of America, N.A.,* 2006 WL 2808635, 2066 Conn. Super. LEXIS 2827 (Super. Ct. Conn. 2006) (laches when depositor delayed fifteen years to demand payment on $50,000 TCD) (*affirmed on other grounds,* 102 Conn. App. 301 (2007)).

Flores waited almost eighteen years after his TCD had matured to bring this lawsuit. Within that period, from the time he learned that UB's Oleai branch had lost record of his deposit until he made any further inquiry into what had happened to his money, more than nine years passed. During that time, he saw UB leave Saipan, to be replaced by a different bank that had not issued the instrument. Throughout this period, he and his wife were living for much of each year in California, UB's home state – in Huntington Beach, a short drive from UB's main office in San Diego – but they took no steps to follow up.

Prior to visiting UB's Oleai branch on Saipan in 1999, Flores knew his original TCD was missing. When he spoke with Lou Guerrero at the branch on February 10, 1999, he learned something far worse: his *money* was missing. He may have searched for the TCD for the next nine years, but he did not search for his money when he was clearly on notice that, as far as the bank was concerned, it was gone. Such lack of diligence is not even close to reasonable. Flores' inexcusable inaction has deprived UB of a fair opportunity to defend itself. For that reason, Flores' lawsuit is barred by laches.

## VI.     CONCLUSION

For the foregoing reasons, all of Flores' claims are barred by the applicable statutes of limitations and, alternatively, by laches. UB's motions for summary judgment on grounds of statute of limitations (ECF No. 83) and laches (ECF No. 81) are GRANTED. UB's remaining partial

summary judgment motions (ECF Nos. 80 and 82) are denied as moot. The Clerk is directed to close the case and enter judgment in favor of Union Bank of California in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 8th day of November, 2013.

RAMONA V. MANGLONA
Chief Judge

24